##### IN THE

## SUPERIOR COURT OF JUDICATURE,

##### FOR THE

## COUNTY OF ROCKINGHAM, DECEMBER TERM,

##### A. D. 1837,

## THE STATE *vs.* ROLLINS.

The body of the common law, and the English statutes in amendment of it, so far as they were applicable to our institutions and the circumstances of the country, were in force here upon the organization of the provincial government; and they have been continued in force by the constitution, so far as they are not repugnant to that instrument, until altered or repealed by the legislature.

An indictment at common law may be sustained in this state, for an assault and false imprisonment—and for kidnapping.

In order to constitute the offence of kidnapping a child under ten years of age, it is not necessary that actual force and violence should be used.

Nor is transportation to a foreign country necessary to the completion of the offence.

Where the defendant, who had in his custody a mulatto boy of six years of age, (who had been placed with him by the overseers of the poor of a town) sold him to a person residing in Alabama, with the intention that he should be carried into that state, and held in servitude until he arrived at the age of twenty-one years; and himself carried him into another town, and delivered him there—it was *held* that he was guilty of kidnapping.

If the provincial statute which punished man-stealing with death abrogated the provisions of the common law for the punishment of kidnapping, upon the repeal of that statute those provisions were revived.

Where an indictment alleged that the defendant kidnapped and sold a mulatto boy, &c., and detained him in imprisonment, in order to transport him to a place where slavery was tolerated, and hold him in slavery during life—it was *held* that a verdict that the defendant was guilty of selling the boy with an expectation of his going into slavery, was imperfect; and a *venire facias de novo* was awarded.

INDICTMENT for assault and false imprisonment, and kidnapping.

The first count alleged, that the defendant, on the 24th of October, 1836, with force, &c., made an assault upon one Benjamin Swett, &c., and unlawfully and injuriously, and without the consent, and against the will of said Swett, imprisoned him, and detained him in prison a long time, &c.

The fourth count alleged, that the defendant, on said 24th of October, with force, &c., did kidnap, entice, and sell one Benjamin Swett, a mulatto boy under the age of ten years, and one of the citizens of the state of New-Hampshire, to one Samuel Bennett, for a large sum of money, to wit. the sum of fifty dollars; and did unlawfully detain the said Swett in imprisonment, at the house of one Jonathan Bennett, at Northwood, in said county, in his custody, in order to transport said Swett out of the state into parts unknown, where slavery is tolerated; against the will and consent of said Swett, and with force and violence, and there to hold him, the said Swett, in slavery, during his life, contrary to law, &c.

Upon the trial it appeared, that on the 24th of February, 1835, the overseers of the poor of the town of Exeter placed said Swett, who was a mulatto boy, about six years of age, and one of the paupers of said town, with the defendant, who resided in Sanbornton, as an apprentice; and the defendant at that time executed a written memorandum, by which he agreed that he would take said Swett, to have and to hold him by an indenture to be made by the overseers in case he should use the boy well; and that he would clear the town from all expense that might accrue, by not returning the boy to the poor house within one year.

It did not appear that any indenture had ever been executed.

On the 24th of October, 1836, the defendant carried the boy from his house, in Sanbornton, to the house of one Jonathan Bennett, in Northwood, a distance of forty miles,

and left him there. He at that time told the wife of said Jonathan that the boy was given to him by the overseers of the poor of Exeter—that he had sold him to one Samuel Bennett, of Alabama, a brother of said Jonathan, until he should be twenty-one years old, for the sum of fifty dollars, and requested her to pay him that sum for said Samuel; and he further said, that said Samuel had paid him five dollars for bringing him from his house to Northwood, and requested her to say nothing about the sale. The boy remained there until the 29th of October, when he was taken away by the overseers of Exeter. It did not appear that he had suffered any constraint or ill usage during the time.

It appeared that Samuel Bennett, who resides in Alabama, and is reputed to be a man of wealth, left the house of said Jonathan on the 17th, and returned again on the 29th of October, and that on the next day he went to the defendant's, and informed him that the overseers had taken away the boy. The defendant thereupon remarked, that he supposed all he wanted was to have the money returned to him; and, upon Bennett's answering in the affirmative, the defendant paid him fifty dollars. Bennett then asked the defendant for a bond which he had executed to him, but on the defendant's saying he preferred to keep the bond, as the overseers might make some difficulty about the boy, a discharge was written upon it, and signed by the defendant. Immediately after this said Bennett returned to Alabama.

The bond, which was produced, was in the penal sum of $10.000, and dated October 28, 1836. The condition recited, that the defendant had indented to said Bennett a certain negro boy, by the name of Benjamin Swett, an apprentice by agreement between the overseers of the poor of Exeter and the defendant, to serve as an apprentice until twenty-one years of age—and provided that if said Bennett should well and truly return said bound and indented negro boy into the state of New-Hampshire, free and independent as other apprentice boys when they had served out their time, the bond should be void, otherwise of force.

The court left it to the jury to find whether the defendant enticed, kidnapped, and sold the boy, as alleged in the indictment, with the purpose and intention there stated; and instructed them, that if they found these facts against the defendant, he was guilty of a crime against the laws of the state.

The jury found the defendant guilty upon the fourth count, "of selling Benjamin Swett, with an expectation of his going into slavery;" and the defendant moved for a new trial, and in arrest of judgment.

*James Bell*, for the defendant, contended, that no such crime as is set forth in the indictment is recognized by the laws of this state. It describes nothing but a private wrong, for which, if proved, the defendant may be answerable in a civil action, but not in a criminal prosecution.

1. The offence charged and attempted to be proved, is not kidnapping, by the English common law.

Blackstone, among other misdemeanors mentions kidnapping, "being the forcible abduction or stealing away of man, woman, or child, from their own country, and selling them into another." This, he says, is unquestionably a very heinous crime, as it robs the king of his subjects, banishes a man from his country, and may in its consequences be productive of the most cruel and disagreeable hardships; and therefore the common law of England has punished it with fine, imprisonment, and pillory. 4 *Black. Com.* 219. *Vide*, also, *East's Crown Law* 429, 430.

As here was no actual transportation from the state, there was no kidnapping. There was no stealing, for Swett was already lawfully in the custody of the defendant, and there is as little pretence of any secreting.

2. No such offence as kidnapping exists in this state. There is, confessedly, no statute now in force, in this state, creating the offence; and we contend that the common law

on this subject has never been here adopted. There is no decided case, nor any judicial record, shewing its existence.

The seventh article in the bill of rights of this state, provides "that the people of this state have the sole and exclusive right of governing themselves as a free, sovereign and independent state;" and by the twelfth article, the inhabitants of this state are not "controllable by any other laws than those to which they, or their representative body, have given their consent."

The constitution provides "that all laws which have 'heretofore been adopted, used and approved in the province, 'colony, or state of New-Hampshire, and usually practised 'on in the courts of law, shall remain and be in full force 'until altered and repealed by the legislature; such parts 'thereof only excepted, as are repugnant to the rights and 'liberties contained in this constitution."

All laws which do not come within the language of this article are no longer in force in this state. Though adopted, used and approved in the province or colony, no laws (if the language is to be construed, as no doubt it should be, according to its natural and obvious import) are continued in force, unless they have also been "usually practised on in the courts of law." Whether any particular law has been so practised upon, is a question of fact, to be decided by a reference to the records of the courts.

The case of *Sackett* vs. *Sackett*, 8 *Pick*. 309, may be cited on behalf of the state; or at all events it contains a full statement of the latitudinarian doctrine of those who hold that the whole common law, or so much of it as judges may happen to think it expedient to enforce, has now the binding force of law in this country. The constitutional provision is nearly the same in Massachusetts as in this state, but we think that case cannot be sustained.

The position of C. J. Parker in that case, is, "that the common law as an entire system has been adopted and practised upon," &c., and that it therefore has the force of law

without any other evidence of use or adoption of its particular provisions. Can this construction of this provision be sustained upon any fair principles of reasoning? The constitution uses the expression, "all laws." Does it refer to systems of laws, or particular provisions or "branches" of law? The framers of the constitution had no acquaintance with more than a single system, viz. the common law; or at most—to adopt a division of some elementary writers—the system of common law, and the system of statute law. If the makers of the constitution intended, by the expression, "all laws," to adopt all the common law, because some parts of it had been adopted and practised upon, there is equal reason for contending that they adopted all the system of statute law of England, because some parts of that system had been in use in this state.

The result, therefore, to which the court there come is, that the constitution, by the expression, "all laws," means only one law, (since there was in fact but one as to which any question could arise) viz. the common law, embracing the English statutes passed before the emigration.

There is, independently of any reasoning as to the probabilities of the case, complete and decisive evidence that the colony of Massachusetts, of which New-Hampshire was then a part, instead of adopting the entire criminal law of England, expressly abolished every part of it which their own legislature should not approve or reënact. *Ancient Charters, &c.* 43.

No repeal of this statute could operate as a revival of the common law, as is shewn by the case, *Commonwealth* vs. *Marshall*, 11 *Pick.* 350.

To hold that all offences indictable at common law are indictable in this state, unless altered by statute, would lead to the multiplying of offences to an enormous extent. The number of actions, important and unimportant, which have in England been held to be indictable, is inconceivable.— *Vide* 6 *Dane's Abr.* 659; 7 *ditto* 253; *Rex* vs. *Robinson,*

2 *Burr. R.* 806 ; *Rex* vs. *Lainsbury*, 4 *D. & E.* 451, 457 ; *Queen* vs. *Birch*, 6 *Mod. R.* 306 ; *Rex* vs. *Darby*, 3 *Mod. R.* 139 ; 3 *Salk. R.* 268 ; 3 *ditto* 187 ; *Queen* vs. *Tracy*, 3 *ditto* 192 ; 3 *ditto* 331 ; 6 *East R.* 136 ; 6 *Wentw.* 364 ; 6 *Mod. R.* 183 ; 3 *M. & S.* 67 ; 4 *M. & S.* 73 ; *Rex* vs. *Joliffe*, 1 *East R.* 154 ; *Strange* 1167 ; *Rex* vs. *Mayor of Tenterden*, 8 *Mod. R.* 114 ; 12 *Mod.* 248 ; 12 *Mod. R.*355 ; *Pococke* vs. *Thornicroft*, 12 *Mod. R.* 454 ; *Crown Cir. Asst.* 361 ; *Trem. P. C.* 91 ; *Rast. Ent.* 333 ; *Stra.* 704 ; *Holt on Libels* 75, 77. And a very great number of other offences will be found enumerated in the English works upon criminal law.

The uncertainty of the principle adopted in Massachusetts cannot be represented in too strong a light. The courts of other states, from the same premises, have come to entirely different conclusions. In Pennsylvania it is held, that no acts of parliament, passed since the settlement of the state, are in force, unless the colonies are expressly named in them. *Morris* vs. *Vanderen*, 1 *Dall. R.* 67 ; *vide*, also, 3 *Binn. R.* 595.

In South Carolina, also, whose laws are the foundation of those of four or five of the south-western states, an act was passed, as early as 1712, declaring what British statutes should be in force in that state. They thus adopted one hundred and twenty-six English statutes, beginning with some passed in the time of Henry III. and Edward I. 6 *Dane's Abr.* 606.

In Virginia a general law swept off all the British laws, and they then set about reënacting such as were congenial to our form of government. 1 *Burr's Trial* 196.

It is held that the United States, as a federal government, have no common law, and that indictments cannot be maintained in their courts for offences at common law. *United States* vs. *Worrall*, 2 *Dall. R.* 384 ; *Resolutions of Virg. of* 1799, 2 *Burr's Trial* 82.

Is there any reason to fear that this construction will

leave any important offence unpunished? In the century and a half that elapsed from the settlement of this state to the period of the revolution, would not our ancestors have been called upon to provide for the punishment of every offence, not only of common, but of the most rare occurrence?

It must not be forgotten, that in addition to our express criminal legislation, wherever prohibitory statutes are adopted, their remedies or sanctions are also adopted, and thus provision is made for the punishment of many offences? 7 *Dane's Abr.* 253, *cites Rex* vs. *Smith, Doug. R.* 44 ; 3 *Bac. Abr.* 97 ; 2 *Hawk. P. C.* 211 ; 6 *Dane's Abr.* 659 ; 3 *Bac. Abr.* 96 ; 1 *Saund.* 135.

Another position which we take, is, that this very offence having been punished by statute in Massachusetts, within a few years of the settlement of the country, and in this state after it was erected into a separate jurisdiction in 1679, the common law as to this offence was superseded. By a colonial law of Massachusetts, of 1646, "if a man stealeth a man, or mankind, he shall surely be put to death." *Ancient Charters, &c.* 59. Man-stealing was also made capital by a law of New-Hampshire in 1679. 1 *Belk. Hist. N. H.* 146. *Vide*, also, 3 *Binn. Rep.* 595 ; *Livingston's Crim. Code* 62 ; 10 *Pick.* 37, *Commonwealth* vs. *Cooley.*

*John Sullivan*, solicitor, for the state. The correct interpretation of the provisions of the constitution is, not that such decisions should be adopted as had actually been made by our courts ; but it was the intention of the framers of the constitution to adopt the general principles of the common law, which had been the guide of the decisions of the courts. If the construction contended for were correct, immediately after the adoption of the constitution the laws of this state could have reached comparatively few cases, either civil or criminal. The decisions of our courts at that period had been few, compared with what

they have since been.   And the facts and circumstances connected with those decisions were not preserved in published reports, but depended upon memory alone, and were soon forgotten.

It is apparent, from these considerations, that the framers of the constitution intended to adopt the body of the common law.   2 *Mass. R.* 176, *Merry* vs. *Prince ;* 1 *Mass. R.* 143, *Mountfort* vs. *Hall ;* 11 *Pick.* 432, *Commonw.* vs. *Davis ;* 5 *N. H. R.* 549, *State* vs. *Batchelder & al.* If the construction contended for were adopted, many offences, if committed, might go unpunished.

The offence of kidnapping is punishable at common law, and the offence charged in the fourth count amounts to the crime of kidnapping.   2 *East's Crown Law* 429, 430.   In *Roscoe on Crim. Ev.* 465, is the following description of the offence :    " Kidnapping, which is an aggravated species of false imprisonment, is the stealing, or carrying away, or secreting of any person."

It is said, 1 *Chit. Gen. Prac.* 40 : " The maliciously, by ' force or fraud, leading or taking away, or decoying or en- ' ticing away, or detaining any child, male or female, under ' the age of ten years, with intent to deprive the parent or ' parents, or other persons having the lawful possession of ' such child, knowing the same to have been so taken away, ' is felony, and punishable by transportation and imprison- ' ment."

It is argued that, in order to constitute kidnapping, the person seized should be conveyed into a foreign country. This might be necessary, if the definition of Blackstone were adopted, without reference to any other.

Such a requirement would be inexpedient in this country. It would not be broad enough to embrace offences to be guarded against here.   And the authorities show that such is not the English doctrine.   In *East's Crown Law* 430, it is said—" The forcible abduction, or carrying away of any person, is *greatly aggravated* by sending him from his own to another country."

The employment of force is not necessary to the commission of the offence ; because the injury to the person seized would be equally great whether he were forced or coaxed away and sold into slavery. He may be as perfectly and as permanently deprived of his liberty by persuasion as by force. Blackstone says—" The *spiriting away* and stealing of children is punishable," &c. Chitty says—" The *leading away, decoying*, or *enticing away* of a child constitutes the offence."

It is enough if any steps are taken to effect the unlawful purpose, although the person seized is rescued. According to the authorities, it is enough if a person shall be *privy to, or aid, or assist, or consent* to the carrying away of any person. 10 *Wheat. R.* 141 ; 9 *ditto* 389. The form of the indictment in *Chitty's Crim. Law* is authority on this point : " Sold in order to transport," &c.

The court suggested that the verdict might be insufficient. The verdict of the jury was given verbally, by the foreman, that the prisoner was guilty on the fourth count. Why it was reduced to writing in this case I know not, for verdicts in criminal cases are almost uniformly verbal. There is enough in this case for the court to know, with perfect certainty, what the verdict of the jury really was. Counsel, in the course of the argument, repeatedly stated that the prisoner was found guilty on the fourth count, and the case itself expressly finds that the prisoner was found guilty on the fourth count.

PARKER, J. It is objected that the provisions of the common law for the punishment of the crime of kidnapping have never been in force in this state ; and this objection is based upon the position, that the constitution has adopted and given force and efficacy only to such particular provisions of the common law as can be shown to have been used and approved in the province, colony, or state, and usually practised on in the courts

of law, prior to the present organization of the state government.

We are of opinion that this position cannot be maintained.

The charter of "The Council established at Plymouth, in the county of Devon, for the planting, ruling, ordering and governing of New-England in America," granted by James I., under which the settlement of this state commenced, provided, among other things, that the council and their successors, governors and officers, should have, within the precincts of New-England, full power and authority to govern and rule the inhabitants, according to such laws, orders, &c. as should be established by the council, "and in defect thereof, in cases of necessity, according to the good discretions of the said governors and officers respectively, as well in cases capital and criminal, as civil, both marine and others, so always as the said statutes, ordinances and proceedings be, as near as conveniently may be, agreeable to the laws, statutes, government and policy of this our realm of England." And it declared that all the king's subjects who should inhabit within the colony, and their children born within the limits thereof, should have and enjoy all the liberties and franchises and immunities of free denizens and natural subjects with any other of his dominions, to all intents and purposes, as if they had been abiding and born within the kingdom.

It has been held in Massachusetts that the common law was in force there from the earliest settlement of the country, notwithstanding that in many instances proceedings were had which were not in conformity with it. The supreme court of that state say—"Our ancestors, when they came into this new world, claimed the common law as their birth-right, and brought it with them, except such parts as were judged inapplicable to their new state and condition." 2 *Mass. R.* 534, *Commonw.* vs. *Knowlton;* 8 *Pick.* 315, *Sackett* vs. *Sackett.*

The common law, so far as it was applicable to the state

and condition of the people and the circumstances of the country, was certainly introduced here for the regulation of the courts of justice on the organization of the province of New-Hampshire as a separate government; with a right, however, in the legislative power, to make provision for peace and good government, subject to a negative on the part of the crown.

The commission constituting a President and Council "to take care of the said tract of land called the Province of New-Hampshire, and of the planters and inhabitants thereof, and to order, rule and govern the same," made the president and council, and their successors, a court of record for the administration of justice in all cases, "as well criminal as 'civil, with full power to give judgment and award execu-'tion, so always that the forms of proceeding in such cases, 'and the judgment thereupon to be given, be as consonant 'and agreeable to the laws and statutes of this our realm of 'England as the present state and condition of our subjects 'inhabiting within the limits aforesaid, and the circumstan-'ces of the place, will admit."

The first enactment of the general assembly, convened in pursuance of the charter, was "that no act, imposition, law or ordinance be made or imposed upon us, but such as shall be made by the said assembly, and approved by the president and council from time to time." Another enactment, however, provided that the laws they had formerly been governed by should be a rule in judicial proceedings, "so far as they will suit our constitution, and not be repugnant to the laws of England," until others were legally published.

There seems to be no reason to doubt, therefore, that the body of the English common law, and the statutes in amendment of it, so far as they were applicable to the government instituted here, and to the condition of the people, were in force here, as a part of the law of the province, except where other provision was made by express statute, or by local usage. And this so continued until the period of

the revolution. Governor Wentworth, in his last message to the assembly of the province, referred to the commission appointing President Cutts and a council, as having " laid the foundation of the constitution by which the province hath since been governed ;" and said, " the laws of the province rest upon this foundation."

The form or plan of civil government adopted by the congress of the colony, January 5, 1776, was intended for a temporary purpose, and made no change in this respect.

The declaration of independence was read and published in the assembly in September, 1776, and the colony assumed the name and style of the State of New-Hampshire ; and in April, 1777, a formal act passed, " for the reëstablishing the general system of laws heretofore in force in this state ;" which provided " that all the acts and laws in force in this ' state, (at the time the present form of government was as- ' sumed) with every article, direction, and power in the same ' contained, so far as they are not repugnant to and in- ' compatible with the present form of government in this ' state, its independence on Great Britain, or are not repealed ' and disannulled or altered by any act or law made and ' passed by the Council and House of Representatives of this ' state since the said assuming of government, be revived, ' be enacted, directed and ordered to abide and remain in full ' force, and accordingly to be exercised, practised and put in ' execution," &c. It is perfectly apparent that the body of the common law, as previously in force, was comprehended in this enactment. That was part, and a very important part, of the general system of laws which were to be reës- tablished by the act. If it was not, as a body, comprehend- ed in the act, it must either have become entirely nugatory —which cannot be supposed, for without some parts of it the administration of justice could not have been continued —or it must have remained in force by some inherent vigor of its own ; for there is nothing to indicate that a separation was then to be made in it, and such parts only of it as could

be shown to have been actually used in the courts of justice, to be adopted, and the residue, which was in force before, although not shown to have been used, to be rejected. If any part of it was within the act, the whole body of it, previously in force, was so, except such parts as were incompatible with the new form of government.

In this state of things the constitution was adopted, in 1783, containing the provision relied on by the defendant, that " all the laws which have heretofore been adopted, ' used and approved, in the province, colony, or state of New- ' Hampshire, and usually practised on in the courts of law, ' shall remain and be in full force until altered and repealed ' by the legislature ; such parts thereof only excepted as are 'repugnant to the rights and liberties contained in this con- ' stitution."

That the body of the common law, so far as it existed at this time in the state, was within the meaning and intent of this provision, is evident from several considerations. There is no other enactment giving force to the common law here, and it has always, to some extent, been deemed a part of our system of laws. It is not denied that this provision adopts certain portions of it. The phraseology is, " all the laws," &c. But this is not the usual style in speaking of the different provisions or portions of the common law. It is usually designated as a body of law, and not of laws. Had the intention been such as the defendant contends for, the provision would naturally have read, " All the statutes," &c. and " such portions of the common law as have been used and usually practised on," &c.

It seems clear to us that this provision of the constitution was intended as a substitute for the statutory provision of 1777, before cited, and that the clause, " usually practised on in the courts of justice," is no farther restrictive than the provisions in the first charter, (or commission of President Cutts, as it is usually called) and the subsequent statutes. Prior to the act of April, 1777, there had been in

State
vs.
Rollins.

force here, the common law, so far as it was applicable to our institutions—the English statutes made in amendment of it before the emigration—such of those made after as were adopted in practice, and others made specially for the government of the colonies—the acts of the assembly of the colony, and those of the infant state—and, to a limited extent, some provisions of the civil and ecclesiastical law. To these may perhaps be added some matters of local usage. That act reëstablished these laws, so far as they were not repugnant to the new form of government, and ordered that they should be exercised, practised and put in execution. The clause in the constitution comprehended the same laws which of course had been " practised on" in the courts of justice, and also the statutes passed after April, 1777, so far as they were not repugnant to the provisions of that instrument. We think the previous history upon this subject leaves no good reason to doubt the soundness of this construction; for we can imagine no reason why the framers of the constitution should have intended to introduce a rule different from that of the act of 1777, and one which would confine and limit the operation of the common law to such of its particulars as could be shown to have been the subject of actual and usual practice, prior to that period.

If there be any vagueness in this doctrine, it results from the terms of the first charter and the act of assembly which followed it, and from the express provision of the constitution,—and not from any judicial construction or decision. But, under an administration of half a century—in which, so far as is now known, it has been supposed that the common law was originally adopted, so far as it was applicable to the institutions and condition of the country, and that the provision of the constitution had continued it in force to that extent—there has ordinarily been no essential difficulty in ascertaining what provisions of it were to be enforced here. Nothing could be gained in this respect by the construction

contended for by the defendant ; for it would, in many cases, be quite as difficult to determine whether particular provisions had been usually practised on in the courts prior to 1783, as to ascertain whether they are applicable to our institutions and the condition of the country.

If any thing further were necessary to increase our confidence in this construction, it is found in the fact, that the supreme court of Massachusetts, from which state we derive many of our legal provisions, has given a like construction to a similar clause in their constitution. 8 *Pick.* 320, *Sackett* vs. *Sackett.* See, also, 1 *Green.* 226, *Kanavan's case.*

And it seems that the body of the common law was in a similar manner adopted in Pennsylvania. 3 *Binney* 595.

It is further objected, that the evidence is not sufficient to sustain the prosecution.

We are of opinion that the first count, for an assault and false imprisonment, is well sustained on the evidence before us. *Com. Dig., Imprisonment, L ; 2 Chitty's Cr. Law* 599. Every restraint upon the liberty of a free man will be an imprisonment. *Com. Dig., Imprisonment, G ; Co. Litt.* 253. The defendant held Swett for the time as an apprentice, or servant, and might lawfully exercise authority over him as such ; but when he took him and carried him to Northwood, under a contract to transfer him, or his services, to a third person, and especially with a view to his being carried out of the state, that was a restraint upon his liberty and an unlawful imprisonment. And it makes no difference that no actual force, constraint or ill usage was exercised. He was not of an age to consent. The transportation was unlawful ; and, as the defendant carried him to Northwood, and put him into the custody of Mrs. Bennett at that place, he is answerable for the detention there, as an imprisonment. The boy had not the liberty to be where he ought to have been. It would be idle to say there was no restraint because there was no struggle, or because a boy of six years old was not conscious of it.

The evidence will also support the fourth count, if the jury believe that the selling for twenty-one years, and taking the bond, was a pretence; the design and expectation being that Sweet should be held as a slave during his natural life.

Had the indictment alleged an intention to hold him to servitude in another state until twenty-one, that would have been good—as the defendant had no right to sell him to such a servitude.

But as the indictment stands, there should be a finding that the intention was that he should be held in slavery during life. If that is found, the whole count is well maintained. The defendant's only authority was to hold the boy as his servant, until the overseers claimed him. No indentures had been made, and the year had expired. When, therefore, he sold him into servitude until he should become twenty-one, to be carried into another government; and carried him from his own house, and delivered him in pursuance of that agreement, he was guilty of kidnapping. It is only of a more aggravated character, if the intention or expectation was that he should be carried into a state where slavery is tolerated, and held as a slave during life.

The phraseology of the authorities, in describing this offence, is not in all cases precisely the same. It is not necessary that there should be actual violence. It appears from *Designy's case, Th. Raym.* 474, that he "*spirited away* the eldest son of one Turbet, who was a scholar at Merchant Tailors school, and a hopeful youth." Upon an information against him, he was found guilty and fined £500.

Nor do we perceive why it should be necessary, in order to complete the offence, that the party should be carried out of one country and sent into another. If the party is seized, and an actual transportation takes place, with that view, the offence would seem to be complete. A larceny may be

committed, although the goods are not removed from the premises of the owner.

Nor is it material that the intention here was to transport to another of the United States. For this purpose Alabama is as much a foreign state or country as Cuba. The constitution of the United States binds them together for no such object as this. It is even questionable whether it is necessary that a transportation to another state or country should be in contemplation. East says—" The most aggrava-
' ted species of false imprisonment is the stealing and carrying
' away or secreting of any person, sometimes called kidnap-
' ing, which is an offence at the common law, punishable by
' fine, imprisonment and pillory. Of this nature is the offence
' pointed out by the statute 43 Eliz. c. 13, which, reciting
' that many subjects dwelling and inhabiting within the
' counties of Cumberland, Northumberland, Westmoreland,
' and the bishoprick of Durham, had been taken, some from
' their houses, others in travelling, or otherwise, and carried
' out of the same counties, or to some other place within the
' same, as prisoners, and cruelly treated till they have been
' redeemed by great ransoms, &c., enacts" &c. And he says
further—" The forcible abduction or stealing and carrying
' away of any person is greatly aggravated by sending them
' away from their own country into another, properly called
' kidnapping ; though the punishment at common law is no
' more than fine, imprisonment and pillory." *Vide,* also,
*Roscoe on Crim. Evid.* 465.

Nor is it material that Swett had previously been in the employ or custody of the defendant. He had not such a possession of him, that it was impossible for him to seize and carry him away, with the unlawful purpose alleged.

It is further contended, that the ancient provincial statute, punishing man-stealing with death, abrogated the provisions of the common law upon this subject ; and that the subsequent repeal of that statute, although no other was substituted for it, nor any other enactment made upon the subject

matter of it, cannot operate to revive the common law. But the authorities cited do not support the position, and we are of opinion that it cannot be maintained. It may perhaps admit of doubt whether that statute embraced all cases which come under the denomination of kidnapping. Waiving that question, however, it cannot be supposed that the legislature, by the simple repeal of a statute which might well be deemed too sanguinary, intended to extend a perfect impunity to offenders against its provisions, when the offence was one known to the common law, and punishable in a less severe form before the statute. The natural inference, in the absence of any express provision, is that the intention was to restore the milder punishment.

There are authorities which hold that the mere repeal of a statute which repealed a precedent statute, revives the first. *Vide* 2 *Coventry & Hughes' Dig.*, *statute* xiii. ; *Bac. Abr.*, *Statute D* ; 12 *Co.* 7, *Case concerning Bishops.* It is not necessary to discuss that matter at this time. We think it clear that the principle is sound when applied to the simple repeal of a statute, which abrogated the provisions of the common law for the punishment of a particular offence, by substituting a punishment of greater severity.

But no judgment can be rendered on this verdict, as it does not find the offence charged in either count. A sale of the boy, with an expectation of his going into slavery, is not, necessarily, either kidnapping or false imprisonment.

The verdict being imperfect, a *venire facias de novo* must be awarded. 3 *N. H. R.* 106, *Holman* vs. *Kingsbury ;* 2 *Wilson's R.* 367, *Eichorn* vs. *Le Maitre ;* 3 *Bro. & Bing.* 297, *Clement* vs. *Lewis.*