## Cochecho Railroad *v.* Farrington.

The court of common pleas have the power, upon motion, to change the venue in civil actions. But before such motion will be granted, it must be made conclusively to appear that a fair and impartial trial cannot be had in the county where the suit is commenced.

A suit being commenced against the defendant for assessments upon shares subscribed for in the plaintiff's corporation, he moved for a change of venue on the ground that a fair and impartial trial could not be had in Strafford; and in support of his motion, produced evidence showing that the road of the plaintiffs passed through four of the thirteen towns in the county; that in those four towns the subject matter of the suit and of his liability had been very generally discussed and opinions expressed in regard to it; and that of the five hundred and forty-eight stockholders residing in the county, all but twenty-three were residents of the four towns. But, it not appearing that the subject matter of the suit had been generally discussed in the other nine towns, or that opinions had been formed or expressed in those towns—*Held*, that upon the facts shown, the motion must be denied.

Assumpsit, brought to recover the amount of assessments upon certain shares in the plaintiffs' railroad, alleged to have been subscribed for and taken by the defendant.

Before trial, the defendant moved the common pleas in Strafford county, where the action was commenced, that the same be transferred from Strafford to Merrimack, for trial in the latter county; upon the ground that a fair and impartial trial of the cause could not be had in Strafford; and in support of the motion filed sundry affidavits, the purport of which will sufficiently appear in the opinion of the court.

The plaintiffs objected to the motion, and to any change of venue, and on their part also filed affidavits, which will likewise sufficiently appear in the opinion of the court.

*Hobbs & Sanborn*, with whom was *J. Parker*, for the defendant.

At a very early period, actions founded on personal contracts were allowed to be brought in any county, on the maxim *debitum et contractus sunt nullius loci.* Com. Dig.

Cochecho Railroad *v.* Farrington.

Action N. 12, 6; Cowper 160; 1 Saund. 74, n. 2; *Bulwar's case,* 7 Co. 3 a.; 1 Tidd's Prac. 584; 3 Black. Com. 294.

The trial was required to be had in the county where the action was laid. 3 Black. Com. 294.

The statute of 6 Rich. II. chaps. 2 and 4, and the 4th of Henry IV. chap. 18, required all writs to be laid in their proper counties. 1 Tidd's Prac. 543, 544; 3 Black. Com. 294. But under these statutes the courts considered that they were authorized to change the venue. 1 Tidd's Prac. 544; 3 Black. Com. 294.

At common law, both before and since the passage of the statutes of Richard and Henry, the venue or place of trial might be changed, on motion, in personal actions, where a fair and impartial trial could not be had in the county where such proceeding was pending. 1 Tidd's Prac. 548 chap. 25; 2 Arch. Prac. 195 chap. 6; *Mayor of Pool* v. *Bennett,* 2 Strange 874; *Myloch* v. *Saladine,* 3 Burrows 1564; 1 Black. Rep. 450; *Petyt* v. *Berkley,* Cowper 510.

In criminal cases also; 1 Chitty's Cr. Law, 494; *People* v. *Webb,* 1 Hill's (N. York) Rep. 182; 7 Cow. 139.

Of course this might have been done in the Province of New Hampshire after the division into counties, which was done in 1771. Prov. Laws 204.

Upon the revolution, and the adoption of the constitution of 1783 and the constitution of 1792, the body of the common law remained in force here, except so far as it was not adapted to the new condition of things, or was expressly altered. *State* v. *Rollins,* 8 N. H. Rep. 550; N. H. Laws 260, Ed. 1824; Rev. Stat. 39.

This principle is equally well adapted to use as it was before the revolution or the adoption of the constitution. It was altered by the constitution, as to criminal cases. Rev. Stat. 20; N. H. Laws 243. And this serves to show that it was intended to be left in force as to civil cases.

It is unimportant whether this right has been exercised or not. *State* v. *Rollins,* 8 N. H. Rep. 550; *Commonwealth* v.

Cochecho Railroad *v.* Farrington.

*Churchill,* 2 Met. 118; *Sackett & a.* v. *Sackett,* 8 Pick. 309; *Hanavan's case,* 1 Maine Rep. 226. Non-user cannot extinguish the right.

The counsel for the defendant are not aware of any' decisions that the court·do not possess the right. If there are any such to be found, they must have been made before the true principles in relation to the adoption of the common law had been settled by *State* v. *Rollins.*

The right has been exercised in other States. *Delevan* v. *Baldwin,* 3 Caine's 104; *Kent* v. *Dodge,* 3 Johns. 447; *Bell* v. *Morris Canal,* 3 Greene (N. Jersey) 60; *Wiston* v. *Johnson,* Coxe Rep. 260; 3 Harrison 312; 3 Stew. & P. (Ala.) 9.

Our statute of July 3, 1841, N. H. Laws 532 § 1; and chap. 66 § 13 Rev. Stat. recognize the principle. It is rendered imperative on the court to exercise it in a certain class of cases, without an inquiry whether a fair trial can be had; Where a county is a party, the court will change the venue. 3 Black. Com. 383.

The interest of individuals may be so minute in case of paupers, as not to produce any bias or excitement, but the legislature would not suffer any snare to be laid for the consciences of the jury. 3 Black. Com. 383.

There is nothing in the statutes fixing the counties where actions may be commenced, that has any tendency to show that this principle has not been adopted in this State. The act of July 5, 1776, (N. H. Laws, Ed. 1789,) is the first act on this subject; and the first in the book provides that all transitory actions, when both parties are inhabitants of this colony, may be commenced in the county where either of the parties to the suit may be inhabitants, and not elsewhere within this colony. The act of July 5, 1776, remained in force till September 15, 1792. N. H. Laws 86, (Ed. 1797.) The act of February 9, 1791, remained in force till January 9, 1829; N. H. Laws 89, (Ed. 1830;) the same having been postponed by sundry acts. Rev. Stat. chap. 180 § 1.

It seems clear that the court may exercise the authority

Cochecho Railroad *v.* Farrington.

unless there is something in the constitution of the court to prevent. In England, actions are not only transferred from one county to another, but to cities ; and with us there are two conclusive reasons why no impediment exists. First, there is but one court of common pleas. Rev. Stat. chap. 172. Second, the provision by the legislature, by which the court must transfer in some cases, shows that it may be done in others, so far as the constitution of the court is concerned. As to what is sufficient we refer to authorities generally, as stated in 3 Black. Com. 383, and 1 Hill Rep. 179, before cited.

Our affidavits are sufficient. Strafford is a small county, containing only thirteen towns, in eleven of which subscribers reside. The subscribers for stock in the railroad living in the county are 548. The Savings Bank for the county of Strafford is also a subscriber, and such depositors in that bank as reside within the county are interested.

The liability of the defendant in this action, and of other persons sued for subscriptions in the road, has been a subject of general conversation for a long period in the cars on the road, and at the railroad depots at Dover, Somersworth, Rochester, Farmington and Milton, and at the stores, and at numerous other places in the county. And it is believed by the defendant, that a large portion of the citizens of the county have formed and expressed an opinion in relation to the liability of the defendant. This will appear from an examination of the affidavits.

It is submitted by the defendant that the Cochecho Railroad exercises, in the county of Strafford, an influence dangerous to his rights in this action.

*Woodman, Kimball, Christie & Kingman,* for the plaintiffs.

The first position of the defendant, taken in his brief is, that " at a very early period actions founded on personal contracts were allowed to be brought in any county, on the

maxim, ' *debitim et contractus sunt nullius loci.*' " No pro-
position could well be further from the true history of the
matter. At the early period of, and long before the enact-
ment of the law of Henry I. chap. 31, about A. D. 1100, all
actions, both local and what are now called transitory, were,
strictly ordered by law to be tried in the counties where the
cause of action originated. *Unusquisque per paros suos
judicandus est, et ejusdem provinciæ* was the law in all cases,
both criminal and civil.

About three hundred years after this enactment of Henry
I. chap. 31, affirming the common law, the statutes of 6
Rich. II. chap. 2, (1382,) and 4th of Henry IV. chap. 18,
(1403,) were made, to correct and remedy the great abuses
which had grown up, under the maxim of " *debitum et con-
tractus sunt nullius loci,*" of oppressing defendants by bring-
ing personal actions in counties remote from where the con-
tracts were made ; the former enacting, where actions were
so illegally brought, not, that the venue should be changed,
but that the suits should be utterly abated. And this stat-
ute being evaded, on account of its peculiar phraseology, the
latter statute ordered attorneys to be sworn not to practice
the abuse.

Now neither of these statutes conferred the least authori-
ty to change the place of trial in actions ; nor can there be
any trace found of such a practice for any cause, until about
two hundred years after these statutes were passed, viz. in
1603, in the reign of James I. About this time, after so
many years of (it would seem) varying and perplexing
practice under these statutes, the judges conceived that, as
the object of these statutes was to have trials of cases where
it would be most equitable to the parties, they might as
well remove them by motion, on proof of the wrong bring-
ing, as to hold the former and more inconvenient practice.
Cases of prejudice and interest in the jurors of certain very
limited jurisdictions afterwards occurring, they extended the
practice under these statutes to them also. And these stat-

utes, and the whole history of them, show that they never
were intended to authorize the courts to change the place of
trial; but to make a most inflexible rule, where all actions
should be brought, and tried—former judges and attorneys
having by construction of laws and maxims suffered great
abuses, even under the strict law of Henry I. to grow up.
All of the authorities concur in saying that this practice of
changing the venue on motion, whether from the reason of
prejudice or interest in the jurors, or any other cause, was
founded entirely on the statutes of 6 Rich. II. and 4th of
Henry IV. They therefore covered the whole ground of
prescribing and regulating the places of bringing and trying
personal actions.

These views will be found to be sustained by the follow-
ing authorities. 1 Tidd's Prac.; Phil. (Ed. 1840,) 601, 602,
chap. 24; Laws of Henry I. chap. 31; 3 Black. Com. 294;
Gould's Plead. 112, 113; 1 Saunders' Rep. 74, note 2; 2
Salk. 670; 2 Strange 874.

Now were these statutes ever in force in the Province or
State of New Hampshire? If they were, then were also
the practices which grow out of them, if such practices were
adapted to the situation and circumstances and state of
things in the colony or province.

Before the colonial act of March 19th, 1771, the rules and
practice growing out of the statutes of 6 Rich. II. and 4th
of Henry IV. never were adopted in the colony of New
Hampshire. They were not adapted to the state of the
colony, for the reason that there was nothing for them to
operate upon; there were no counties; there was but one
jurisdiction. By this act of 1771 the province was divided
into five counties. Simultaneously with this division, and
by the very same statute, passed in virtue of their charter,
and assented to by the government of England, the whole
subject matter to which the statutes of 6th Rich. II. and 4th
Henry IV. applies was fully provided for, and in a different
and more effectual way. Prov. Laws 204 § 2. In this sec-

tion it is enacted that all transitory actions, wherein both parties are inhabitants of this province, may be commenced in the county wherein either of the parties to the suit shall be inhabitants, and not elsewhere within this province. This provision was reënacted under the State constitution, in 1791, and has remained unaltered to the present time, except in suits for the support of paupers, when the county in which the action must be tried by that provision might be liable for such support.

Now this second section of the provincial statute, while New Hampshire remained a province, and the reënactment of it under the State constitution, entirely excluded and shut out of the province and State the statutes of 6th Rich. II. and 4th of Henry IV. They never entered into our jurisprudence, because the ground was preöccupied and entirely covered by those provincial and State enactments.

Suppose A. an inhabitant of Rockingham, fifty years ago, or at any time since, had brought an action on a contract made in Grafton, with B., an inhabitant of Grafton, in the county of Rockingham. B. comes into court in Rockingham and pleads in abatement, alleging and showing that the contract was made in Grafton ; that he has a large number of witnesses residing there, and cites the 6th of Rich. II. to show that A.'s writ ought to utterly abate. If this statute of Rich. II. is part of our law, and by our State statute the plaintiff could have brought his action in Grafton, why have not such pleas been used in such cases, but for the reason that all lawyers knew that those English statutes and the practice under them, were entirely excluded by our statute.

It is said in the defendant's argument that the provision made in the fifteenth section of chapter 66 of the Revised Statutes for the removal of the trial of pauper cases from one county which might be interested, to another which might not be, was to make it imperative on the courts to change the venue and to take away the discretionary power

to allow it to be tried in the interested county. Now if the practice under the statutes of 6 of Richard and 4 of Henry were at the time of the passage of the pauper act in force here, our courts were just as imperatively bound to change the venue before as after the statute of our State. The decisions of the English courts on that subject were clear and uncontradicted, both before and after our State constitution was adopted. Are not our courts bound as imperatively by common law as by statutes? But our legislature knew the courts had no discretionary power on the subject, and did not intend they should have. Knowing the abuses that had grown out of discretionary powers of courts in jury trials in England, it has been the wise policy of our constitution and laws and courts to allow as little of such discretion as practicable.

The case of the *State* v. *Rollins*, 8 N. H. Rep. 550, has been cited and very much dwelt on, as sustaining the defendant's motion. We do not at all question the soundness of that decision; but we see no analogy between the two cases. There was no pretence in that case that our legislature had altered the English law on the offence of kidnapping. Here, on the subject of venue, the legislature had covered the whole ground.

When the province of New Hampshire was divided into counties, they were so extensive in territory that it was difficult, if not impossible, to conceive of a local prejudice in relation to a law suit, which would prevent an impartial trial. They might as easily have supposed such a prejudice to pervade the whole State; and no provision for such a case seemed called for. None of the cases reported in the English books seem to have been removed for trial, except from jurisdictions altogether more limited than our county of Strafford.

It is not difficult to conceive how the jurors of a whole county may be interested, in a pecuniary way, in cases that might be brought before them, when the county itself might

as a corporation owe a duty; and this was in due time foreseen and provided for by our legislature in pauper cases.

But if the court should be of the opinion that they have the power to change the venue, we contend that the affidavits of the defendant are not sufficient to warrant the granting of the motion; and we refer the court upon this point to *People* v. *Bodine*, 7 Hill 147; *Myloch* v. *Saladine*, Burrows 1564; *Rex* v. *Harris*, Burrows 1333. We contend further that the motion is taken too late. *Asplin* v. *Grey*, Strange 211; 1 Sell. N. P. 272.

EASTMAN, J. The practice of the courts of England to change the venue of transitory actions from one county to another is said to have been first commenced in 1603, in the reign of James I. 2 Black. Rep. 1033; 2 Salk. 670; 1 Bac. Ab. B. 35.

The practice is also said to have grown up under the statutes of 6 Richard II. chap. 2, and the 4th of Henry IV. chap. 18. Gould's Plead. chap. 3 § 103 note 19; 1 Tidd's Prac. 544; 3 Black. Com. 294.

But whenever or however the practice originated, it became thoroughly engrafted upon the common law, long before the independence of this country; and from that time forth, not only has the practice prevailed in the courts of England, but the power is now exercised by the courts of very many if not all of our States, either by force of express statute or the adoption of the common law into the jurisprudence of the same.

In this State we have no statute giving our courts the power to change the venue except in one class of cases; and in that class the courts are required to do it upon motion. By § 15 chap. 66 Rev. Stat. it is provided that "where any county in which any action for the support of a pauper is pending, may eventually be liable for the support of such pauper, under any law of this State, the court shall, on mo-

tion, transfer·such action to an adjoining county for adjudication."

This being the only authority given by the statute of this State, the question arises whether we have the power to change the venue or transfer an action from one county to another, except in the class of cases referred to.

In 1692, by an act of the provincial legislature, passed on the 16th of October of that year, it was enacted and ordained that there should be held and kept a supreme court of judicature, and that there should be four justices, at the least, appointed and commissioned, which supreme court was fully empowered and authorized to have cognizance of all pleas, civil, criminal and mixed, as fully and amply to all intents and purposes whatsoever, as the courts of king's bench, common pleas and exchequer within their majesty's kingdom of England had or ought to have.

The same act provided that the courts of common pleas should have jurisdiction to hear, try and formally determine all actions and causes of action, and all matters and things and causes triable at the common law, of what matter or kind soever, not exceeding twenty pounds.

In 1699, an inferior court of common pleas and a superior court of judicature were established, and their powers enumerated, substantially in the same words as in the act of 1692.

The act of 1699 remained in force until March, 1771, when the " act for dividing this province into counties and for the more easy administration of justice," was passed. The second section of that act provides that instead of the several courts of judicature now established and holden, there shall be and hereby are established to be holden one superior court of judicature, also an inferior court of common pleas and one court of general sessions; all which courts shall respectively hold and exercise like jurisdiction and authority within their respective counties, in all matters and causes arising within such counties, as the superior court of

judicature, inferior court of common pleas and court of general sessions of the peace now respectively hold and exercise, or by law ought to hold and exercise. The organization of the courts, which was made by this act, was done to perfect the system so as to conform to the situation of things occasioned by the division of the province into counties. The general powers of the court were not changed.

It would seem clear, then, that under the provincial government, after the division into counties, the superior court and common pleas possessed the same power to change the venue as did the courts of England; provided that the common law was then in force in the province, and provided also that there was no provincial statute to prevent the exercise of the power.

As to the adoption of the common law, there would appear to be no doubt. The charter of "the council established at Plymouth, in the county of Devon, for the planting, ruling, ordering and governing of New England in America;" the commission constituting a president and council to take care of the tract of land called the Province of New Hampshire, and of the planters and inhabitants thereof, and to order, rule, and govern the same, and the first enactment of the general assembly, convened in pursuance of the charter, all show that the body of the English common law and the statutes in amendment to it, so far as they were applicable to the government instituted here and to the condition of the people, were in force here as a part of the law of the province, except where other provision was made by express statute or by local usage. *State* v. *Rollins*, 8 N. H. Rep. 550; *Sackett* v. *Sackett*, 8 Pick. 315; *Commonwealth* v. *Knowlton*, 2 Mass. 534.

It is, however, contended in argument that by the act of March 19, 1771, by which the province was divided into counties, the powers which had been exercised by the courts of England, after the passage of the statutes of Richard II and Henry IV, were entirely superseded; so that, in fact, our

courts have never had the authority to change the venue since the division of the province into counties, and that before the division there was no occasion to exercise the power.

The clause of the act upon which this argument is founded is as follows: " All transitory actions wherein both parties are inhabitants of this province, may be commenced in the county wherein either of the parties to the suit shall be inhabitants and not elsewhere in this colony." Prov. Laws 204. These provisions were reënacted by the statute of 1791, and are substantially the same as those of section 1, chapter 180 of the Revised Statutes.

The first reading of this provision of the act might create the impression that it contained an implied prohibition of the transfer of an action from one county to another; but it will be perceived that the enactment is confined to the commencement of actions merely; and it is but a fair inference that had the provincial legislature intended to have restricted the trial of actions to the county in the same manner that they did their commencement, they would have so enacted. The provisions are much in principle like those of the 6th of Richard II and the 4th of Henry IV, and being enacted with a full knowledge of the practice of the courts under those statutes, they were designed, we think, to make the law of the province, in this respect, substantially the same as that of England. At all events, we do not think that the true reading of the provisions of the act relied upon, will sustain the construction that the trial of actions shall be absolutely confined to the counties where they were commenced; and we think that the courts of the province had the power to change the venue.

Such was the state of the law at the time of the revolution, and such the power of the courts; has there been any change since?

On the 5th of July, 1776, an act was passed " for establishing courts of law for the administration of justice within

this colony." The preamble and first section were as fol-
lows: " Whereas the cruel and unnatural war commenced
and prosecuted by Great Britain against the United Colo-
nies, hath rendered it necessary for the protection and secu-
rity of the lives and interests of the inhabitants of this col-
ony, to assume and establish a new form of government
therein, for the administration whereof it is equally neces-
sary and expedient to establish courts of justice: Therefore
be it enacted by the Council and House of Representatives
in General Court assembled, that instead of the several
courts of judicature heretofore established and holden by the
laws of this colony under the former government thereof, in
the several counties therein, shall be and hereby are estab-
lished to be holden, one superior court of judicature . . . of
four justices, to be appointed and commissioned thereto by
the Council and House of Representatives of said colony.
. . . . Also an inferior court of common pleas . . . . and
one court of general sessions. All which courts shall re-
spectively hold and exercise like jurisdiction and authority
within their respective counties, in all matters and causes
arising within such counties, as the superior court of judi-
cature, inferior court of common pleas, and court of general
sessions of the peace, heretofore respectively held and exer-
cised within this colony, or by law ought to hold and ex-
ercise."

The next act on the subject was passed February 9th,
1791, and was " an act for establishing courts of law for the
administration of justice within this State, and designating
their powers and regulating their proceedings in certain
cases." This act established a court of common pleas, to
try all cases of the value of more than forty shillings, triable
by common or statute laws. Also a superior court, with all
the powers and authority which the superior court of judi-
ture within the State had previously held and enjoyed, or
by law ought to hold and enjoy.

This act remained in force until June, 1813, when the

Cochecho Railroad *v.* Farrington.

judiciary of the State was re-organized, by the establishment of a supreme judicial court and circuit courts of common pleas. These courts had the same powers vested in them as the superior court of judicature and the court of common pleas had previously exercised. The act of 1813 was repealed in 1816, and the former system revived, and continued in force until 1832. The system then established has substantially remained until the present time, the appointment of circuit justices affecting in no way the powers of the superior court or the common pleas; and an examination of all the several acts that have been passed upon the subject since the act of 1771, will show that the powers of the courts have not been abridged.

The history of the adoption of the common law since the commencement of the revolution, appears to be as follows. In September, 1776, the declaration of independence was read and published in the assembly, and the colony then assumed the name and style of the State of New Hampshire. In April following, a formal act was passed, " for the reëstablishing the general system of laws heretofore in force in this State," and provided "that all the acts and laws in force in this State (at the time the present form of government was assumed) with every article, direction and power in the same contained, so far as they are not repugnant to and incompatible with the present form of government in this State, its independence of Great Britain, or are not repealed and disannulled or altered by any act or law made and passed by the Council and House of Representatives of this State since the said assuming of government, be revived, be enacted, directed and ordered to abide and remain in full force, and accordingly to be exercised, practised and put in execution," &c.

Prior to the passage of this act of April, 1777, there had been in full force here, the common law, so far as it was applicable to our institutions; the English statutes made an amendment of it before the emigration, and of course the

statutes of Richard II. and Henry IV., before referred to; such also of the English statutes, made after the emigration, as were adopted in practice, and others made specially for the government of the colonies; also the acts of the assembly of the colony and those of the infant State; and to a limited extent, some provisions of the civil and ecclesiastical law; and this act of 1777 reëstablished these laws, so far as they were not repugnant to the new form of goverment, and ordered that they should be exercised, practised and put in execution. Per *Parker*, C. J., in *State* v. *Rollins*, 8 N. H. Rep. 563, 564.

There would certainly seem to be no doubt that the common law was embraced in this enactment of 1777.

Next follows the constitution of 1783, in which is contained the provision that " all the laws which have heretofore been adopted, used and approved, in the province, colony or State of New Hampshire, and usually practised on in the courts of law, shall remain and be in full force until altered and repealed by the legislature; such parts thereof only excepted as are repugnant to the rights and liabilities contained in this constitution."

This provision of the constitution was evidently intended as a substitute for the act of April, 1777, and, as was said in *State* v. *Rollins*, we think the previous history upon this subject leaves no good reason to doubt the soundness of this conclusion; for we can imagine no reason why the framers of the constitution should have intended to introduce a rule different from that of the act of 1777, and one which would confine and limit the operation of the common law to such of its particulars as could be shown to have been the subject of actual and usual practice, prior to that period.

The provisions of the constitution of 1783 are also those of the constitution of 1792, which is now the fundamental law of the State, and, consequently, according to our views, the body of the common law, as embraced in the act of 1777, and in the constitutions of 1783

and 1792 is in full force, except where the same may have been changed by subsequent acts of the legislature.

The result of our examination, then, is, that from the acts organizing the judiciary, as well of the province and colony as of the State, and the powers that have from time to time been conferred upon and declared to exist in the courts, there would be nothing to prevent this court from ordering a venue to be changed, were it to assume the duties of a *nisi prius* court; nor is there anything in the organization of our common pleas which precludes them from exercising the power, that court being a court of common law, and being governed by the rules and principles of the superior court, in all matters in which it has jurisdiction. Unless, therefore, we have some statute prohibiting the exercise of this power, or which, by implication, prohibits it, it may be exercised in all proper cases.

The only statutes that we have been able to find which have a bearing upon the question, are those which have already been alluded to, being, first, the provincial statute of March, 1771, providing that transitory actions may be commenced in the county where either of the parties may be inhabitants and not elsewhere, as also the act of 1791 and chapter 180 of the Revised Statutes, containing substantially the same provisions as the act of 1771; and second, the statute in regard to the trial of pauper cases, where the county may eventually be liable.

With respect to the acts of 1771, 1791 and the provisions of the Revised Statutes, we have briefly stated our views, and expressed the opinion that they do not prohibit the court from changing the venue, although they confine the parties to specific counties in the commencement of actions. As to the statute respecting the trial of pauper cases in certain events, the Legislature saw fit to make it imperative upon the court to transfer the action on motion. It seems that they thought it essential to a fair trial, in that class of cases, that they should be transferred, and so did not leave

Cochecho Railroad v. Farrington.

it to the discretion of the court. Perhaps no argument of much weight can be drawn from this enactment in regard to the question before us, but it may as fairly be contended that the Legislature left it to be inferred that the court had discretionary power in ordinary cases, as to say that this exclusive enactment shows that the power is not to be exercised except in this class of cases alone. It is clear that they did not suppose that there was any constitutional difficulty in the way.

It may also be fairly argued from the 17th article of the bill of rights, that the convention adopting the constitution intended to leave the regulation of the matter in civil actions to the court. That article contains a requisition for the trial of criminal offences in the county in which they are committed, except in cases of insurrection, when the Legislature are authorized to change the venue upon the representation of the judges of the superior court that an impartial trial cannot be had. From this it may be presumed that if the convention had not intended not to interfere in the matter of civil actions, they would have inserted some provision in regard to them, as well as definitely settling the question in respect to criminal prosecutions.

In view of the whole subject, we think there can be no doubt of the power of the court in the premises, and that the venue may, in all proper cases in civil actions be changed. But what may be a proper case is a question of importance, and one which, under all the circumstances, must be judged of and decided by the court upon the facts presented.

We are not aware that a motion of this kind has ever heretofore come before this court, and we may certainly regard it as a compliment to the intelligence, impartiality and candor of our jurymen generally that it has not. Still, cases may arise where it will be proper for the court to interfere. As the population of some of our smaller counties becomes more dense, and the business interests of the larger

towns and cities become more intimately connected with the remote sections of the counties, so that excitements, partialities and prejudices may generally pervade society, it will be more difficult to obtain impartial juries, and still more difficult to satisfy parties that they have had fair trials.

The grounds upon which venues have been changed have been, first, for the purpose of securing fair and impartial trials. It is discretionary with the court to grant the motion or not; but when it is made to appear that an impartial trial cannot be had without the change, the motion will be granted. *Mayor of Poole* v. *Bennett*, Strange 874; *Mylock* v. *Saladine*, Burrows 1564; 1 Wilson 298; 1 Cromp. Prac. 110; Graham's Prac. 464.

But in order to induce the court to change the venue, on the ground that a fair trial cannot be had in the county where the venue is laid, the fact alleged must be made conclusively to appear. *New Windsor Turnpike Co.* v. *Wilson*, 3 Caines 127; *Zabriskie* v. *Banden*, 1 Caines 487; 2 Johns. Cases 335; 2 Caines 46; *Messenger* v. *Holmes*, 12 Wend. 203; *Murry* v. *The New Jersey Railroad and Transportation Co.* 3 Zabr. 63; *State* v. *Burris*, 4 Harr. 582; *People* v. *Bodine*, 7 Hill's 147; *Bank of Cleveland* v. *Ward*, 11 Ohio 128; *Bowman* v. *Ely*, 2 Wend. 250. In the last case cited, *Marcy*, J., in delivering the opinion of the court uses this language: " The court will not, on any speculative opinions formed by individuals, however respectable, interfere with the ordinary course and practice of the court in the administration of justice. Pervading as may be the excitement referred to, the court repose confidence in the intelligence and integrity of the freeholders of Monroe. Should it unfortunately happen that the apprehension of the plaintiff (the disagreement of the jury) is realized, he will not be remediless, as it will then be in sufficient time to interpose the strong arm of the law, to cause the course of justice to flow unpolluted by passion or prejudice."

The venue is also changed for the convenience of the parties and witnesses. This is a well established practice in some jurisdictions. But however expedient and necessary this practice may be in large states, in this State, where the county seats may be reached in a single day, from its remotest towns, and where the depositions of witnesses, in civil actions, who reside more than ten miles from the place of trial may be taken, it is not probable that any motion of the kind would be granted. To transfer actions from one county to another for this reason only, would oftentimes derange the dockets of the counties, and impose upon small counties burdens which would not fairly belong to them, and which would in some instances be extremely onerous.

In the case before us, the application to change the venue is founded upon the alleged fact that a fair and impartial trial cannot be had in Strafford; and, upon the principles which we have laid down, the motion should be granted, if the court find the fact to be as the defendant alleges.

Strafford county contains thirteen towns. The Cochecho Railroad corporation are the plaintiffs, and the action is brought to recover assessments upon shares in the road, subscribed for by the defendant. The road passes through four of the towns of the county, one of which, Dover, is much the largest in population of any in the county, and the most important in its business relations. Rochester, another of the four, is the residence of the defendant, and is the third town in the county. One of the others is the seventh in population, and the other is the tenth.

The defendant produced, in support of the motion, a large number of affidavits, from which it appears that the subject matter of his liability to the plaintiffs has been very often spoken of and discussed and opinions expressed in the plaintiffs' cars, at the several stations of the road, and in public places in the four towns through which the road passes. His affidavits also show that his liability has been somewhat discussed in some of the other towns, but not to any

general extent.   The plaintiffs, in opposition to the motion,
produced several affidavits, tending to show that in towns
through which the road does not pass, the subject of the
suit has not been a matter of discussion; also that the suit
has not been so extensively spoken of in the cars of the
plaintiffs as the defendant represented.

It further appeared from the affidavits that the number of
stockholders in the road, residing in the county, was five
hundred and forty-eight, all of whom, however, excepting
twenty-three, are residents of the four towns through which
the road passes.

Such are the facts upon which the motion is founded, and
although it might perhaps be difficult to organize an impar-
tial jury from the four towns through which the road passes,
yet the court will not presume that it might not be done
even there, were it necessary.   But in the remaining nine
towns we discover nothing in the evidence that leads us to
the conclusion that the subject-matter of the suit has been
particularly discussed, or that opinions have been formed, or
that any extraordinary difficulty will exist in securing an
unprejudiced jury.   And we will not suffer ourselves to
doubt that the defendant can have a fair and impartial trial
in Strafford.   We place too much confidence in the intelli-
gence and integrity of the jurymen of Strafford to suppose
that a fair and impartial trial cannot be had in that county.

But there is another consideration connected with this
question which should not be overlooked.   There is but one
county in our State through some parts of which one or
more railroads does not pass, and probably a year will not
elapse before that one will be penetrated.   Actions similar
to the present are believed to be pending in several of the
counties, and among the rest in the county of Merrimack,
to which it is moved to transfer this case for trial.   It is not
improbable, therefore, that considerable discussion may have
taken place in some localities in Merrimack and in other
counties, in regard to the general question.   Merrimack is

traversed more or less by six railways; and without having any positive knowledge of the fact, we should be inclined to think that the question of the liability of subscribers to pay assessments upon the shares of stock for which they have subscribed, had been more generally discussed in that county than in Strafford. Still, we do not apprehend any particular difficulty in procuring an impartial jury in Merrimack to try such an issue, whenever a jury for that purpose may be required. But we need not pursue the inquiry any further. Upon the facts laid before us, the venue cannot be changed.

<em>Motion denied.</em>